# UNITED STATES DISTRICT COURT

# DISTRICT OF SOUTH DAKOTA

# CENTRAL DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **3:23-CR-30022-RAL** |
| **Plaintiff,** | |
| **vs.** | **REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS** |
| **(1) TYSON QUIGLEY; AND**<br>**(2) ERWIN WHITE LANCE.** | |
| **Defendants.** | |

In this burglary and firearm possession case, Tyson Quigley, a/k/a Tyson Stands, and Erwin White Lance seek to suppress evidence seized in a vehicle search. They maintain the vehicle was within the curtilage and there was no probable cause to search it. White Lance separately seeks to suppress statements he made at the scene of the search and the next day. Because the vehicle was not within the curtilage and probable cause existed for the search and because White Lance's statements were not the product of interrogation or the fruit of a poisonous tree, the Court recommends that the suppression motion, as supplemented, be denied.

1

## BACKGROUND

On January 1, 2023, at around 9:00 a.m. Rosebud Sioux Tribe (RST) Officer Lowicha Falls Rock responded to a request for assistance at Leslie Fool Bull's residence in St. Francis. Falls Rock arrived and met with Bryan Eagle Deer, who said two men wearing red bandanas entered the residence that morning looking for Chuck Cordier. One of them had a bat and the other a black handgun and neither would leave. Eagle Deer identified the man with the gun as Tyson Stands (Quigley) and the man holding the bat as White Lance.

Falls Rock also talked to Leslie Fool Bull, the homeowner, who corroborated Eagle Deer's statements and identifications. Fool Bull though advised that Quigley came into her room without permission carrying a gun. She likewise informed Falls Rock that the two men left in a gold Chrysler bearing dealer tags. Armed with this information, Falls Rock left to try to find Quigley and White Lance.

Later that day, RST Officer Ian Little Shield joined Falls Rock in the search for the two suspected burglars. Just after 4:00 p.m., Falls Rock and Little Shield located a gold Chrysler car with dealer tags parked in the yard, outside of Ione Quigley's house, in Saint Francis. The doors to the car opened when officers approached. Falls Rock drew his duty weapon as he stepped from his vehicle. Quigley got out of the rear driver side door of the car. About the same time, two females exited the car while the male, in the front passenger

2

seat, stayed put. Falls Rock eventually collared Quigley and placed him in the patrol vehicle.

Meanwhile, RST Officer Jeremi Blacksmith, who had followed Falls Rock and Little Shield to the residence, went over to the front passenger side of the car and interacted with White Lance. While doing so, Blacksmith noticed bruising and swelling around White Lance's eyes and cheeks. After White Lance identified himself, Blacksmith handcuffed and put White Lance in Blacksmith's vehicle. Blacksmith then walked back over to the car. From outside of it, he observed a spent pistol shell casing in the windshield wiper well and a red baseball bat and a roofing hatchet in the floorboard where White Lance had been sitting.

Little Shield saw the gun shell casing too and reported it over the radio. In response, RST Special Agent Richard Kumley, who was not at the scene yet, sent a radio message that the two individuals in custody could be the Fool Bull burglary suspects. Hearing Kumley's message, Little Shield opened the car's back driver side door and found a pistol in the pouch behind the driver's seat.

Kumley interviewed White Lance the ensuing day (January 2) at the tribal jail.[1] During the interview, and after being Mirandized, White Lance made incriminating statements.

---

[1] Suppr. Hr'g Tr. 97 (Aug. 4, 2023); Suppr. Hr'g Ex. 14 (Aug. 4, 2023).

Afterward, a federal grand jury indicted Quigley and White Lance, charging them both with burglary and Quigley with being a prohibited person in possession of a firearm. White Lance subsequently moved to suppress the evidence seized from the car and the statements he made to Kumley during the jail interview.[2] Quigley joined White Lance's suppression motion.[3] The government responded to the arguments raised in the motion, resisting them all.[4] At the suppression hearing, White Lance moved to supplement his motion to include the on-the-scene statements he made to Little Shield.[5] The government said it did not need more time to prepare or brief the issue.[6]

## DISCUSSION

### A. Curtilage / Standing

The government contends that White Lance and Quigley lack standing to challenge the search and seizure.[7] White Lance and Quigley say that they not only have standing, but are also entitled to enhanced protection because the search took place in the curtilage of Ione's house, where Quigley stayed.[8] The government insists that the car was not in the curtilage and that officers were lawfully present when they observed the baseball bat, gun shell casing, and other evidence.[9]

---

[2] Docket Nos. 42-43.

[3] Docket No. 44.

[4] Docket No. 45; Suppr. Hr'g Tr. 84-85.

[5] Suppr. Hr'g Tr. 9.

[6] *Id*. at 10.

[7] Docket No. 45 at 3-4.

[8] Docket No. 43 at 6-7; Suppr. Hr'g Tr. 99, 106-07.

[9] Docket No. 45 at 5-8.

"Fourth Amendment rights are personal ... [and] may not be vicariously asserted."[10] A person's "capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims [its protection] has a legitimate expectation of privacy in the invaded place."[11] "[T]he person challenging the search has the burden of showing both a subjective expectation of privacy and that the expectation is objectively reasonable; that is, one that society is willing to accept."[12] Several factors are relevant to determining whether a person has a legitimate expectation of privacy: "whether the party has a possessory interest in the things seized or the place searched; whether the party can exclude others from that place; whether the party took precautions to maintain the privacy; and whether the party had a key to the premises."[13]

When it comes to  expectations of privacy and its protection, "the Fourth Amendment has drawn a firm line at the entrance to the house."[14] For Fourth Amendment purposes, curtilage—the area immediately surrounding and associated with the home—is regarded as part of the home.[15] The Fourth Amendment, however, does not protect open fields, which may be any "unoccupied or undeveloped area outside of the curtilage" and "need be neither 'open' nor a 'field.'"[16] "The 'centrally relevant

---

[10] *United States v. Douglas*, 744 F.3d 1065, 1071 (8th Cir. 2014) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)).

[11] *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)).

[12] *United States v. Mendoza*, 281 F.3d 712, 715 (8th Cir. 2002) (citations omitted).

[13] *Id.* (quoting *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999)).

[14] *Payton v. New York*, 445 U.S. 573, 590 (1980).

[15] *See United States v. Dunn*, 480 U.S. 294, 300 (1987).

[16] *United States v. Mathias*, 721 F.3d 952, 955 (8th Cir. 2013) (quoting *Dunn*, 480 U.S. at 304).

consideration' in any curtilage determination is 'whether the area in question is so intimately  tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection.'"[17] Four factors—the so-called *Dunn* factors—help determine whether an area is within a home's curtilage: (1) the proximity of the area to the home; (2) whether the area is included within an enclosure that surrounds the home; (3) the nature of the uses to which the defendant puts the area; and (4) the steps taken by the resident to protect the area from people who pass by.[18] "A given *Dunn* factor may weigh in favor of finding that the area is curtilage, while another may not."[19] The *Dunn* "factors are not applied mechanically or in isolation."[20]

That said, "where a legitimate law enforcement objective exists, a warrantless entry into the curtilage is not unreasonable under the Fourth Amendment, provided that the intrusion upon one's privacy is limited."[21] "Thus, no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—*such* as driveways, walkways, or similar passageways."[22]

The first three *Dunn* factors weigh heavily against a finding of curtilage. White Lance's car (the gold Chrysler) was parked in Ione's front yard next to her driveway,

---

[17] *United States v. Wells*, 648 F.3d 671, 677 (8th Cir. 2011) (quoting *Dunn*, 480 U.S. at 301).
[18] *Id.* (citing *Dunn*, 480 U.S. at 301).
[19] *United States v. Bausby*, 720 F.3d 652, 656 (8th Cir. 2013).
[20] *Id.* (citing *United States v. Gerard*, 362 F.3d 484, 488 (8th Cir. 2004)).
[21] *United States v. Bennett*, 972 F.3d 966, 971 (8th Cir. 2020) (citations and internal quotations omitted).
[22] *Id.* (internal citations omitted).

about 35 yards (105 feet) from her house.[23] So the vehicle was not near Ione's residence.[24] Nor was it within an enclosure surrounding the dwelling.[25] And there was no evidence presented that the area where the car was situated is used for an "intimate activity associated with the sanctity of [Ione's] home and the privacies of life."[26]

The final factor also weighs against a curtilage finding. White Lance's vehicle was in Ione's yard close to the street. Falls Rock and Little Shield spotted the vehicle—which matched the description of the car from the Fool Bull burglary[27]—while driving on a public thoroughfare.[28]

*Collins v. Virginia*,[29] which White Lance and Quigley cite,[30] is distinguishable. In *Collins*, the Supreme Court held that the automobile exception to the warrant requirement did not apply to a fully tarped motorcycle located in the top portion of a partially enclosed

---

[23] Suppr. Hr'g Ex. 2-3, 6, 10, 12; Suppr. Hr'g Tr. 28-29, 49.

[24] *See Wells*, 648 F.3d at 677 (first *Dunn* factor weighed in favor of curtilage because officers were standing only a *few* feet behind home); *see also Mathias*, 721 F.3d at 956 (no curtilage when only first *Dunn* factor favored finding of curtilage); *Bausby*, 720 F.3d at 656-57 (motorcycle not within curtilage despite being in front yard and close to residence).

[25] Suppr. Hr'g Tr. 29-30 (Q: "Is there any kind of a fence around the yard or the residence?" A: "No, sir."); *see Mathias*, 721 F.3d at 956 (Second *Dunn* factor went against finding curtilage when location where officer standing and looking through fence not enclosed); *Bausby*, 720 F.3d at 656 (motorcycle not within curtilage even though enclosed by chain-link fence surrounding residence).

[26] *Wells*, 648 F.3d at 677 (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)); *see also Mathias*, 721 F.3d at 956 (strip constituted open field for purposes of Fourth Amendment).

[27] Suppr. Hr'g Tr. 18 (Did you at some point locate the suspect vehicle? A "Yes, sir, we did." Q: "Can you describe that?" A: "We located a gold-colored Chrysler at a residence west of St. Francis, and the vehicle … had dealer plates on it.").

[28] *See California v. Ciraolo*, 476 U.S. 207, 213 (1986) (officers need not shield their eyes from home or its curtilage when passing by on public thoroughfares).

[29] 138 S. Ct. 1663, 1670 (2018).

[30] Docket No. 43 at 6.

driveway that abutted the house.[31] By contrast, White Lance's car was parked in an open

yard, more than 100 feet from the home, and near (and clearly visible from) a traveled

roadway.[32] Because the car was not within the curtilage of Ione's house, the rule in *Collins*

does not apply and prohibit officers from searching the car under the automobile

exception.

At any rate, under Eighth Circuit precedent, Falls Rock and Little Shield had a

legitimate law enforcement objective for being in Ione's yard and whatever privacy right

infringement may have occurred was minimal.[33] The getaway car sat, running, in a

location visible from the street. Officers recognized the car and Quigley as they

approached. It was reasonable for them to conclude that one or both of the burglary

suspects were in the car. Any intrusion on the property and home "curtilage," to check

on the car and its occupants, was justified under the circumstances.[34]

### 1. White Lance

White Lance is not entitled to enhanced protection under the Fourth Amendment

because his car was parked outside the curtilage to Ione's dwelling. And he "did not own

or live at the property; he was not an overnight guest."[35] He therefore "lacks standing to

---

[31] *Collins,* 138 S. Ct. at 1670-71.

[32] Suppr. Hr'g Exs. 1-3; Suppr. Hr'g Tr. 18, 28-30.

[33] *See Bennett,* 972 F.3d at 972; *United States v. Weston,* 443 F.3d 661, 667 (8th Cir. 2006); *United States v. Raines,* 243 F.3d 419, 421 (8th Cir. 2001).

[34] *See Bennett,* 972 F.3d at 972-73.

[35] *United States v. Wright,* 844 F.3d 759, 762 (8th Cir. 2016); *see also Carter,* 525 U.S. at 90 ("an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not.").

challenge the entry into" Ione's curtilage "because he did not have a reasonable expectation of privacy in that area."[36] But as the owner of the car, he has standing to contest the search of it.[37]

### 2. Quigley

Unlike White Lance, Quigley "was not an owner, registered user, or driver of the [car] when it was stopped; rather, he was merely a passenger."[38] Generally, a "passenger does not have standing to challenge a vehicle search where he has 'neither a property nor a possessory interest in the automobile.'"[39] Quigley did not argue that he had an expectation of privacy in White Lance's car or its contents. And for good reason. The Eighth Circuit has made it clear that a person who is a passenger in a vehicle he does not own has no expectation of privacy to challenge the search of the vehicle and any evidence found inside.[40] Without curtilage to draw from as an overnight guest[41] and a privacy interest to point to, Quigley lacks standing to object to the vehicle search.[42]

---

[36] *Wright*, 844 F.3d at 762.

[37] *See Rakas*, 439 U.S. at 141.

[38] *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015).

[39] *Id.* (quoting *Rakas*, 439 U.S. at 148).

[40] *See United States v. Crippen*, 627 F.3d 1056, 1063 (8th Cir. 2010); *United States v. Spotted Elk*, 548 F.3d 641, 657 (8th Cir. 2008); *United States v. Barragan*, 379 F.3d 524, 530 (8th Cir. 2004); *see also United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001) (as a passenger, defendant had no right to challenge search of car).

[41] Suppr. Hr'g Tr. 99; *see Minnesota v. Olson*, 495 U.S. 91, 96 (1990).

[42] *See Rakas*, 439 U.S. at 141; *see also Crippen*, 627 F.3d at 1063 (as a mere passenger in vehicle, with no legitimate expectation of privacy in place where evidence found, defendant cannot challenge search of vehicle).

### B. Vehicle Search

White Lance further claims that the automobile exception does not apply because of the seven-hour period between the burglary report and the search of his car.[43] The government asserts that this interval did not make the reported information stale.[44] The government further asserts that officers were outside the curtilage and lawfully present when they viewed evidence before the search.[45] The plain view doctrine, the government says, provided officers with probable cause to search the car under the automobile exception.[46]

A warrantless search of a vehicle for contraband is allowed under the Fourth Amendment if an officer has probable cause for the search.[47] An officer's observations, made during the consensual search of a vehicle, may provide the officer with probable cause to expand the breadth of the search under the automobile exception to the warrant requirement.[48]

---

[43] Docket No. 43 at 3-5.

[44] Docket No. 45 at 10-11.

[45] *Id.* at 8-9.

[46] *Id.* at 8-11.

[47] *See Collins*, 138 S.Ct. at 1670; *United States v. Ross*, 456 U.S. 798, 825 (1982).

[48] *See United States v. Murillo-Salgado*, 854 F.3d 407, 417 (8th Cir. 2017); *see also United States v. Guevara*, 731 F.3d 824, 831 (8th Cir. 2013) (once troopers discovered hidden engine compartment during consensual search, they had probable cause to search vehicle for drugs in destructive way); *United States v. Alverez*, 235 F.3d 1086, 1089 (8th Cir. 2000) (officers' observations of vehicle gave them probable cause to believe there was contraband in spare tire, thus allowing them to expand scope of search under automobile exception and to remove that tire from trunk and examine it more closely).

"Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place."[49] "Probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication."[50] This "practical and common-sensical standard" is based on "the totality of the circumstances" and requires only "the kind of fair probability beyond which reasonable and prudent people, not legal technicians, act."[51] "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search,"[52] including any closed containers in the vehicle, without regard to ownership of them.[53] And in the probable cause determination, an officer "may draw inferences based on his own experience."[54]

Plain view may help establish "the fullest possible measure of probable cause."[55] The plain-view doctrine requires that (1) the officer not violate the Fourth Amendment

---

[49] *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003) (citations omitted); *see also Florida v. Harris*, 568 U.S. 237, 243 (2013) ("a police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present" (internal quotation, alterations, and citation omitted)).

[50] *Wells*, 347 F.3d at 287 (citations omitted).

[51] *Harris*, 568 U.S. at 244 (internal quotations, alterations, and citations omitted).

[52] *Ross*, 456 U.S. at 825.

[53] *See Wyoming v. Houghton*, 526 U.S. 295, 301-02 (1999).

[54] *Ornelas v. United States*, 517 U.S. 690, 700 (1996).

[55] *Wells*, 648 F.3d at 678 (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 468 (1971)).

in arriving at the place from which the item could be plainly viewed; (2) the item's incriminating character be immediately apparent; and (3) the officer have a lawful right of access to the item itself.[56] "[A]n item's incriminatory nature is immediately apparent if the officer at that moment had 'probable cause to associate the [item] with criminal activity' ... meaning 'the facts available to the officer would warrant a man of reasonable caution in the belief that [the] item may be contraband or stolen property or useful as evidence of a crime.'"[57]

On the morning of January 1, Falls Rock went to the Fool Bull house in response to a report that a male was "waving a gun and driving a gold-colored car."[58] After arriving, he talked to Eagle Deer who said that two men entered the home—uninvited— and would not leave after being requested to do so.[59] Eagle Deer informed Falls Rock the men were White Lance and Stands (Quigley), and they had a bat and gun respectively.[60] According to Eagle Deer, the men fled in a gold Chrysler that had dealer tags.[61]

Falls Rock, along with Little Shield, began looking for White Lance and Quigley and the vehicle they were last seen in.[62] Later in the day, the two officers spotted a gold

---

[56] *See United States v. Lewis*, 864 F.3d 937, 943 (8th Cir. 2017) (*citing United States v. Vinson*, 805 F.3d 1150, 1152 (8th Cir. 2015)); *see also Horton v. California*, 496 U.S. 128, 133-37 (1990) (discussing these requirements).
[57] *United States v. Craddock*, 841 F.3d 756, 759 (8th Cir. 2016) (*quoting Texas v. Brown*, 460 U.S. 730, 741-42 (1983) (plurality opinion)).
[58] Suppr. Hr'g Ex. 6 at 7; *see also* Suppr. Hr'g Tr. 15.
[59] Suppr. Hr'g Ex. 6 at 7; Suppr. Hr'g Tr. 16.
[60] Suppr. Hr'g Ex. 6 at 7; Suppr. Hr'g Tr. 16.
[61] Suppr. Hr'g Ex. 6 at 7; Suppr. Hr'g Tr. 16-17.
[62] Suppr. Hr'g Ex. 6 at 9-10; Suppr. Hr'g Tr. 18.

Chrysler car, with windowed dealer plates, in Ione's front yard.[63] The car was still on and parked near the street.[64] Seeing the car, Falls Rock turned on his emergency lights and pulled in behind it.[65] As Falls Rock got out of his vehicle, Quigley and two females exited the car.[66]

Little Shield recognized both Quigley and White Lance.[67] When Quigley reached for his waistband, Falls Rock drew his gun and told Quigley to get on the ground.[68] Quigley did not initially comply with Falls Rock's commands but ultimately did so and went to his knees.[69]

At some point, Blacksmith showed up and began tending to White Lance, who remained in the front passenger seat of the car.[70] Blacksmith noticed that White Lance had bruising around his eyes and swelling to his left cheek.[71] After placing White Lance in his vehicle, Blacksmith returned to the car.[72] On the floor of the car, below White Lance's seat, Blacksmith observed a red baseball bat and a roofing hatchet.[73] He also caught sight of a spent pistol shell nestled between the hood and windshield of the car.[74]

---

[63] Suppr. Hr'g Ex. 2 at 1, 3, 6; Suppr. Hr'g Tr. 18.
[64] Suppr. Hr'g Tr. 18.
[65] Id.
[66] Suppr. Hr'g Ex. 6 at 9.
[67] Suppr. Hr'g Tr. 73; Suppr. Hr'g Ex. 6 at 9.
[68] Suppr. Hr'g Tr. 19, 73-74; Suppr. Ex. 6 at 9-10.
[69] Suppr. Hr'g Tr. 74.
[70] Suppr. Hr'g Exs. 6 at 10 & 23, 12 at 16:14:48-16:15:15.
[71] Suppr. Hr'g Ex. 6 at 23.
[72] Suppr. Hr'g Exs. 6 at 23, 12 at 16:14:48-16:16:35.
[73] Suppr. Hr'g Ex. 6 at 23.
[74] Suppr. Hr'g Exs. 6 at 10 & 23, 12 at 16:16:33-16:16:53.

Little Shield saw the shell casing as well and announced it on the police radio.[75] He then strode over to one of the rear car doors, opened it, and located a black pistol in the back pocket of the driver's seat.[76]

White Lance's main arguments—both of which hinge on a curtilage finding—are: (1) the automobile exception does not apply because of *Collins*; and (2) the plain view doctrine does not apply either because the officers were not lawfully present in Ione's yard.[77] But, as already established, the open area of Ione' front yard, where White Lance's car was situated, is not part of her curtilage. Falls Rock and Little Shield had the right to be where they were when they made their observations in the yard.[78]

White Lance also contends that the shell casing, baseball bat, and hatchet were not in plain view because Blacksmith did not report seeing them while apprehending White Lance and until returning to the car.[79] That Blacksmith did not notice these items does not mean they were not immediately apparent. Blacksmith may very well have been focused on getting White Lance out of the car and secured.[80] It is understandable why Blacksmith may not have observed the items when he first encountered White Lance. Indeed, as one of the perpetrators of an armed burglary that occurred earlier in the day, White Lance posed a risk to Blacksmith (and other officers) and needed to be handled

---

[75] Suppr. Hr'g Exs. 6 at 9, 12 at 16:17:20-16:17:40.

[76] Suppr. Hr'g Ex. 12 at 16:19:08-16:19:30.

[77] Docket No. 43 at 6.

[78] *See Ciraolo*, 476 U.S. at 213.

[79] Docket No. 43 at 5.

[80] Suppr. Hr'g Exs. 6 at 23, 12 at 16:14:48-16:16:35.

with care. The Court has no reason to doubt when Blacksmith saw the items and when their incriminating nature became readily apparent to him.[81]

Often the plain view doctrine works along with one of the warrantless search and seizure exceptions. If a vehicle contains evidence of a crime and officers observe that evidence in plain view, they may search the vehicle under the "automobile exception" to the warrant requirement.[82] The plain view observations of officers are what provide the necessary probable cause for the exception.[83]

Here, officers had a gold, dealer plated, car that matched the description of the vehicle the Fool Bull burglars left in.[84] Little Shield identified White Lance and Quigley—the purported burglars—after they emerged from the car.[85] The bat and shell casing officers saw in and outside the car aligned with the weapons Eagle Deer and Fool Bull said White Lance and Quigley had wielded.[86] And Falls Rock smelled a strong odor of alcohol coming from Quigley and the car and noticed there were open containers of alcohol inside it.[87] With this information, officers had more than enough probable cause to believe that Quigley and White Lance were the ones who burgled the Fool Bull

---

[81] Suppr. Hr'g Ex. 6 at 23.

[82] *See Ross*, 456 U.S. 798, 825 (1982); *United States v. Shackleford*, 830 F.3d 751, 753–54 (8th Cir. 2016); *Wells*, 347 F.3d at 287.

[83] *See Colorado v. Bannister*, 449 U.S. 1, 4 (1980) (probable cause to search vehicle after officer saw items recently stolen in plain view and occupants matched descriptions of suspected thieves).

[84] Suppr. Hr'g Tr. 16-18, 72.

[85] *Id.* at 16-17, 73.

[86] *Id.* at 16, 20, 74; Suppr. Hr'g Ex. 6 at 7.

[87] Suppr. Hr'g Tr. 21.

residence earlier in the day and that White Lance's car contained evidence of the burglary.[88]

Because officers had new, freshened, and corroborated probable cause by the time they searched, the Court need not address White Lance's staleness claim.[89] The search of the car and seizures of evidence were proper under the automobile exception.

### C. Statements

White Lance, individually, supplemented his motion at the suppression hearing. He argued that his post-arrest statements to Little Shield, while in Little Shield's vehicle, violated *Miranda*.[90]

Reinforcing the Fifth Amendment, the *Miranda* decision requires law enforcement to warn suspects of their rights before engaging in custodial interrogation.[91] Custody,[92] for purposes of *Miranda*, occurs when: (1) a suspect is formally arrested, or (2) the suspect's "freedom of movement" is restricted to a "degree associated with a formal

---

[88] *See United States v. Randolph,* 628 F.3d 1022, 1025-26 (8th Cir. 2011) (officer had probable cause to search vehicle after observing gun on driver's side floor in plain view); *United States v. Frazier,* 429 F. App'x 730, 733 (10th Cir. 2011) ("a spent shell casing on the passenger seat of [d]efendant's car … provided probable cause to believe that there was a gun in the vehicle."); *United States v. Parker,* 371 F. Appx. 749, 750 (9th Cir. 2010) (seeing box of ammunition gave officers probable cause to search vehicle for firearm); *United States v. Williams,* 526 F.2d 1000, 1001 (6th Cir. 1975) (officer's plain view of shotgun shell in vehicle supported probable cause to search vehicle); *United States v. Valandra,* No. CR 11–30010–RAL, 2011 WL 3439919 at *10 (D.S.D. Aug. 5, 2011) (officer had probable cause to search car after observing cup of beer in plain view).

[89] Docket No. 43 at 3-5.

[90] Suppr. Hr'g Tr. 9.

[91] *Miranda v. Arizona,* 384 U.S. 436, 478-79 (1966) (setting forth rights a suspect, who is taken into custody, must be advised of before being questioned to safeguard privilege against self-incrimination).

[92] *See Howes v. Fields,* 565 U.S. 499, 508-09 (2012) ("As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion.").

arrest."[93] Interrogation is any question, word, or action that an officer should know is "reasonably likely to elicit an incriminating response."[94]

White Lance was in handcuffs and under arrest when he made his statements.[95] So he was indisputably in custody.[96] But whether he was interrogated, for *Miranda* purposes, is another matter. Blacksmith and Little Shield noticed White Lance had injuries to his face before they detained him in Blacksmith's vehicle.[97] After the initial search of the vehicle, Little Shield checked on White Lance's injuries to his face, which included bruising and a bleeding gash on his cheek.[98] While doing so, Little Shield asked how long White Lance had "been like this?"[99]

White Lance said he received the injury the previous night.[100] Little Shield inquired if the blood was White Lance's and started to say something more when White Lance interrupted and began making statements about his medical condition, videos showing him getting beat up, and his car.[101] Little Shield mostly responded with "yeah" or "okay" but did comment that he was checking to make sure White Lance did not "need stiches

---

[93] *California v. Beheler*, 463 U.S. 1121, 1125 (1983).
[94] *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).
[95] Suppr. Hr'g Ex. 12 at 16:32:55-16:34:40.
[96] *See United States v. Garreau*, 735 F.Supp.2d 1155, 1167 (D.S.D. 2010) (defendant in handcuffs, under arrest, and sitting in back seat of patrol car "was, without question, in custody" under *Miranda*).
[97] Suppr. Hr'g Ex. 6 at 23; Suppr. Hr'g Tr. 75.
[98] Suppr. Hr'g Exs. 6 at 9, 12 at 16:32:50-16:34:41; Suppr. Hr'g Tr. 75.
[99] Suppr. Hr'g Ex. 12 at 16:32:53-16:33:00.
[100] *Id*. at 16:33:00-16:33:04.
[101] *Id*. at 16:33:05-16:34:36.

or anything" on his wound.[102] Eventually, Little Shield shut the door to his vehicle,

without questioning White Lance about what happened the night before or anything else,

and told Falls Rock that White Lance was "gonna need to go to the E.R."[103]

Reviewing the video footage and record, the Court finds that none of Little Shield's

inquiries amounted to impermissible interrogation.[104] His questions, "Let me see your

eye, man. How long you been like this? Is that your blood? That's all yours, then, huh?"[105]

were not interrogatory. Given their context, the questions were designed to help Little

Shield assess White Lance's physical condition and not to expand or enhance his guilt.[106]

White Lance's other statements were spontaneous and unresponsive to anything Little

Shield said.[107] Little Shield's queries did not create culpability for White Lance or worsen

his predicament.[108]

---

[102] *Id*. at 16:33:57-16:34:00.

[103] *Id*. at 16:35:08-16:35:10.

[104] *Id*. at 16:32:53-16:34:45.

[105] *Id*. at 16:32:53-16:33:16.

[106] *See Miranda*, 384 U.S. at 478 ("Voluntered statements of any kind are not barred by the Fifth Amendment"); *United States v. Jackson*, 852 F.3d 764, 771-74 (8th Cir. 2017) (officers' "questions regarding [defendant's] health do not constitute an interrogation"); *United States v. Chipps*, 410 F.3d 438, 445-46 (8th Cir. 2005) (when defendant volunteered he knew one FBI agent was looking for him and another agent asked how long defendant had known about warrant, that was only a request for clarification and not an attempt to enhance defendant's guilt); *United States v. Jackson*, No. 4:14-CR-135, 2015 WL 13344108, at *4 (D.N.D. Aug. 5, 2015) ("Considering the agents' observation of [defendant's] appearance and behavior, the agents' questions were aimed at assessing [defendant's] physical and mental health, not [seeking] incriminating information. The agents' questions regarding [defendant's] health did not constitute an 'interrogation' for *Miranda* purposes.").

[107] *See Miranda*, 384 U.S. at 478.

[108] *See generally* 2 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, *Criminal Procedure*, § 6.7(d) (4th ed. 2015 & Nov. 2021 Update) ("Volunteered" statements and follow-up questioning).

Although he was in custody for purposes of *Miranda*, White Lance cannot prevail on his *Miranda* claim, because he was never interrogated. White Lance's statements may be used against him, whether he testifies or not.

### D. Tainted Fruit

Lastly White Lance separately contends that the statements he made to Kumley on January 2 stem from the illegal search of the car the day before and should be suppressed under the exclusionary rule.[109] But because officers did not skirt the Fourth Amendment or overstep their authority, there is no "poisonous tree" for any "tainted fruit" to grow or fall from. It follows then that White Lance's statements are fully admissible at trial.[110]

### CONCLUSION

The portion of Ione's front yard, where White Lance's car stopped, was not curtilage, because the car was far from her residence, not within an enclosure or an area intimately associated with the home, and no efforts were made to conceal the car from passersby. Unlike White Lance, Quigley lacks standing to contest the search of the car because he has no privacy interest in it. White Lance, on the other hand, has standing to complain because he owned the car.

---

[109] Docket Nos. 42 at 1, 43 at 7.

[110] *See United States v. Rutledge*, 61 F.4th 597, 603 (8th Cir. 2023); *United States v. Hessman*, 369 F.3d 1016, 1023-24 (8th Cir. 2004); *see also United States v. Virrueta*, No. 1:22-CR-10037-CBK, 2023 WL 3045918, at *6 (D.S.D. Mar. 10, 2023) (no encroachments in connection with defendant's vehicle stop and detention, so statements not tainted fruit of poisonous tree), *report and recommendation adopted*, 2023 WL 3044743 (D.S.D. Apr. 21, 2023).

The search of White Lance's vehicle was proper under the automobile exception. Officers observed White Lance and Quigley get out of a gold dealer plated car, information that matched the reports of eyewitnesses to the burglary at Fool Bull's. Officers were not within the curtilage of Ione's house—and thus were lawfully present— when they plainly viewed the red bat and pistol shell casing in and on the car. These two items corresponded with the weapons White Lance and Quigley had on hand during the burglary. And there were open alcoholic beverage containers in the car and Quigley smelled strongly of alcohol. All told, this information provided more than enough probable cause to arrest Quigley and White Lance, search the car they were in, and seize items from it.

White Lance's statements, at the scene and the next day, are all admissible. Little Shield did not interrogate White Lance, within the meaning of *Miranda*¸ and the statements White Lance made to Kumley were not the tainted fruit of any Fourth Amendment violation.

**RECOMMENDATION**

In accordance with the authorities and legal analysis set forth in this report, and the record now before the Court, it is

RECOMMENDED that Quigley and White Lance's motion to suppress evidence and statements [111] be denied. It is further

---

[111] Docket Nos. 42-44.

RECOMMENDED that White Lance's supplemental motion to suppress statements[112] be likewise denied.

## NOTICE

The parties have 14 calendar days after service of this report and recommendation to object to the same.[113] Unless an extension of time for cause is later obtained,[114] failure to file timely objections will result in the waiver of the right to appeal questions of fact.[115] Objections must "identify[] those issues on which further review is desired[.]"[116]

DATED this 7th day of September, 2023.

BY THE COURT:

MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE

---

[112] Suppr. Hr'g Tr. 9.

[113] *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b).

[114] *See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

[115] *See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[116] *Arn*, 474 U.S. at 155.