UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TYSON QUIGLEY, a/k/a Tyson Stands, and ERWIN WHITE LANCE,<br><br>Defendants. | 3:23-CR-30022-RAL<br><br>OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION AND DENYING MOTION TO SUPPRESS |

Defendants Tyson Quigley, a/k/a Tyson Stands (Quigley), and Erwin White Lance (White Lance) face charges for First Degree Burglary, and Quigley separately faces a charge for Prohibited Person in Possession of Firearm.[1] White Lance filed a motion to suppress certain evidence, Doc. 42, and brief in support thereof, Doc. 43, in which Defendant Quigley joined, Doc. 44, 46. Magistrate Judge Mark A. Moreno held a hearing on Defendants' Motion to Suppress on August 4, 2023, and thereafter issued a Report and Recommendation for denial of Defendants' Motion to Suppress. Doc. 79. White Lance objected to the Report and Recommendation, Doc. 82, which Quigley once again joined, Doc. 83.

This Court reviews a report and recommendation under the statutory standards of 28 U.S.C. § 636(b)(1), which states that "[a] judge of the [district] court shall make a de novo determination

[1] The United States has filed a Superseding Indictment charging each defendant with knowingly brandishing, carrying, and using a firearm "during and in relation to a crime of violence" under 18 U.S.C. §§ 924(c)(1)(A) and (2). Doc. 86.

of those portions of the report or specified proposed findings or recommendations to which objection is made." After a de novo review of the evidence, this Court overrules Defendants' objections, adopts Magistrate Judge Moreno's Report and Recommendation, Doc. 79, and denies Defendants' Motion to Suppress, Doc. 42.

## I. Facts Relevant to Motions to Suppress

On January 1, 2023, at around 8:57 a.m., Rosebud Sioux Tribe Law Enforcement (RSTLE) Dispatch received a call for service from Leslie Fool Bull requesting an officer and reporting that a man showed up at her house waving a gun and left in a gold-colored Chrysler. ST at 15; Ex. 4 at 2, 6 at 7.[2] RSTLE Dispatch relayed the request to RSTLE Officer Lowicha Falls Rock, who responded to the Fool Bull residence after first patrolling the immediate vicinity in search of the gold Chrysler. ST at 15; Ex. 6 at 7. Once at the Fool Bull residence, Officer Falls Rock spoke with Bryan Eagle Deer who described how two men dressed in all black and wearing red bandanas entered the Fool Bull residence looking for Chuck Cordier, Leslie Fool Bull's boyfriend. Ex. 6 at 7. Eagle Deer stated that one of the two men had a gun and the other carried a bat; he identified the man carrying the bat as White Lance and the man wielding the gun as Quigley. ST at 16; Ex. 6 at 7. Officer Falls Rock also took a report from Leslie Fool Bull. ST at 16; Ex. 6 at 7. Fool Bull's report corroborated Eagle Deer's statements and identification of the two men. Ex. 6 at 7. Fool Bull further informed Officer Falls Rock that Quigley entered her bedroom uninvited and waved the pistol around demanding to know where he could find Cordier. Id. Ultimately, the two men left in what Eagle Deer and Fool Bull described as a gold Chrysler with dealer tags. Id. Fool Bull remembered the dealer tags to have a red coloring. Id.

[2] The transcript from the August 4, 2023 suppression hearing will be cited as "ST"; Exhibits admitted at the suppression hearing will be cited as "Ex."

Officer Falls Rock spent part of his shift patrolling surrounding communities in Todd County searching for the gold Chrysler with dealer tags. ST at 17; Ex. 6 at 7. Later that day, at around 3:00 p.m., RSTLE Officer Ian Little Shield joined Officer Falls Rock. ST at 18; Ex. 6 at 9, 10. Shortly after 4:00 p.m., the two officers, followed by RSTLE Officer Blacksmith, located a gold Chrysler with dealer tags and a red BECK[3] dealer plate at the residence of Ione Quigley, Quigley's mother. ST at 18, 98; Ex. 6 at 9, 10. The Chrysler was parked in Ione's front yard, but Officer Falls Rock saw that the vehicle had its engine running, so he activated his emergency lights and pulled up behind it. ST at 18; Exs. 10 at 16:37:50, 11 at 14.

As the officers left their patrol vehicles to approach the Chrysler, Quigley and two females exited the car. ST at 19, 72–73; Ex. 6 at 9, 10, 23. White Lance remained seated in the front passenger seat. ST at 19; Ex. 6 at 9, 23. The two females went into Ione's house, but Quigley stopped after Officer Falls Rock drew his duty pistol and commanded him to get on the ground. ST at 73–74; Ex. 6 at 9–10. Quigley complied, and Officer Falls Rock, with Officer Little Shield's assistance, handcuffed him and placed him in the back of his patrol car. ST at 74; Ex. 6 at 9, 10. After assisting Officer Falls Rock, Officer Little Shield walked over to the front passenger door where Officer Blacksmith had handcuffed White Lance, who was then placed in another police cruiser. Ex. 6 at 9, 10, 23; Ex. 12 at 16:16:55. Officer Blacksmith returned to the passenger side of the Chrysler were he and Officer Little Shield saw a spent brass shell casing in the windshield wiper well, a red baseball bat resting between the front passenger seat and center console, and a roofing hatchet laying on the floor in front of the passenger seat. Ex. 2 at 2, 6 at 9, 10, 23. Officer

[3] Beck Motor Company is a car dealership located in Pierre, South Dakota, which holds itself out as serving the communities of Chamberlain, Eagle Butte, Huron, and Rapid City, South Dakota. https://www.beck-motors.com/.

Little Shield shared his discovery of the shell casing over the radio with Officer Falls Rock and RSTLE Special Agent Richard Kumley. Exs. 12 at 16:17:25, 13 at 3.

Officers Little Shield and Blacksmith then searched the rest of the vehicle while Officer Falls Rock began taking pictures documenting the car. Ex. 10 at 16:17:00. During the vehicle search, Officer Little Shield opened the rear driver's side door from which Quigley had exited and located a .40 caliber Smith and Wesson handgun tucked in the seat pouch behind the driver's seat. Exs. 12 at 16:19:26, 13 at 4. Officer Little Shield conveyed this to Officer Falls Rock who then documented the gun for evidence. Exs. 10 at 16:17:30, 13 at 5.

After completing the vehicle search, Officer Little Shield spoke to White Lance about some facial injuries he appeared to have suffered. ST at 74–75; Exs. 12 at 16:32:56, 13 at 12. White Lance told Officer Little Shield that he had been assaulted the previous night. Exs. 12 at 16:32:56, 13 at 13. Based on Officer Little Shield's recommendation, Officer Blacksmith transported White Lance to the emergency room for a medical evaluation. Ex. 6 at 24. The next day, Special Agent Kumley interviewed White Lance at the Rosebud Sioux Tribe Adult Correction Facility. ST at 88–89. Special Agent Kumley read White Lance the Rosebud Sioux Tribe Advice of Rights Form containing the Miranda warnings, which White Lance signed, expressing his willingness to answer questions without an attorney present. ST at 89; Ex. 9.

## II. Discussion

### A. Factual Objections

Defendants first object to the Report and Recommendation's finding that Officer Blacksmith "observed a spent pistol shell casing in the [Chrysler's] windshield wiper well and a red baseball bat and a roofing hatchet on the floor where White Lance had been sitting." Doc. 82 at 1 (quoting Doc. 79 at 3). Defendants object because Officer Blacksmith did not testify at the

suppression hearing and his police report was admitted into evidence over several objections by defense counsel. Doc. 82 at 1; ST at 90–93.

The Federal Rules of Evidence do not strictly apply when determining the admissibility of evidence at a suppression hearing. Fed. R. Evid. 104(a), 1101(d)(1); United States v. Matlock, 415 U.S. 164, 172–173 (1974) ("[T]he rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence."); United States v. Henderson, 471 F.3d 935, 938 (8th Cir. 2006). "At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." Henderson, 471 F.3d at 938 (citing United States v. Raddatz, 447 U.S. 667, 679 (1980)). In Matlock, the Supreme Court of the United States held that it was error for a district court to exclude evidence based on a violation of the rules of evidence in a suppression hearing. 415 U.S. at 175. The Supreme Court even expressed positive sentiment for the proposition that "in proceedings where the judge himself [or herself] is considering the admissibility of evidence [like suppression hearings], the exclusionary rules, aside from rules of privilege, should not be applicable." Id. In such instances, "the judge should receive the evidence and give it such weight as his [or her] judgment and experience counsel." Id.

Magistrate Judge Moreno did just that; in overruling Defendants' objections to the admission of Suppression Hearing Exhibit 6, which includes Officer Blacksmith's police report, Judge Moreno said that "[t]o the extent that the exhibits are cumulative or not the best evidence, the Court can decipher that out in its review and examination of the evidence." ST at 92. Judge Moreno also noted that Defendants' objections primarily go the "the weight of the evidence, not its admissibility." Id. at 93.

Page three of the Report and Recommendation references Officer Blacksmith and the content of his police report largely to furnish background information on White Lance's arrest, as well as the identification of the brass shell casing and red baseball bat, all of which could have been inferred or drawn directly from other evidence at the suppression hearing, such as Officer Falls Rock's and Officer Little Shield's own police reports, their body-camera footage, and the transcripts from the body-camera footage. Ex. 6 at 10; Exs. 11, 12, 13, 14. In their objections, Defendants present no argument on how Judge Moreno gave undue weight to Officer Blacksmith's police report, recited inaccurate facts, or came to an erroneous legal conclusion as a result. Instead, Defendants merely state that the exhibit supporting such facts was admitted over their objections. But as Judge Moreno informed counsel when overruling their objections, the Federal Rules of Evidence do not require the court to disregard such evidence when deciding suppression issues. ST at 92–93. And without Defendants demonstrating how Judge Moreno afforded undue weight to Officer Blacksmith's report contrary to what experience and judgment would counsel, this Court finds no error on page three of Judge Moreno's portrayal of the facts and thus overrules Defendants' objection to the Report and Recommendation's reference to Officer Blacksmith's police report.

**B. Legal Objections**

The Defendants also object to Judge Moreno's reasoning that White Lance lacks standing to assert a curtilage argument; that the Chrysler was not within the curtilage of Ione Quigley's home; that even if it were within the home's curtilage, RSTLE had a legitimate law enforcement objective for entering the curtilage and the invasion of privacy was minimal; that the search of the Chrysler was proper under the automobile exception and plain view doctrine; that White Lance's statements to Officer Little Shield did not violate Miranda; and that White Lance's statements to

Special Agent Kumley were not "fruit of the poisonous tree." This Court addresses each objection in turn below.

**1. Fourth Amendment Standing**

Defendant White Lance objects to the portion of the Report and Recommendation that states he lacks standing to assert a curtilage argument involving the Ione Quigley residence. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; United States v. Douglas, 744 F.3d 1065, 1069 (8th Cir. 2014). The Indian Civil Rights Act of 1968 (ICRA) extends these fundamental protections to guard against violative conduct by tribal law enforcement in Indian country. See 25 U.S.C. § 1302(a)(2); United States v. Clifford, 664 F.2d 1090, 1091 n.3 (8th Cir. 1981). The Fourth Amendment is a "personal right that must be invoked by an individual," Minnesota v. Carter, 525 U.S. 83, 88 (1998); it cannot be asserted vicariously, Douglas, 744 F.3d at 1071 (quoting Alderman v. United States, 394 U.S. 165, 174 (1969)). A person's "capacity to [assert] the protection of the Fourth Amendment depends . . . upon whether the person who claims [its protection] has a legitimate expectation of privacy in the invaded place." Carter, 525 U.S. at 88. A legitimate expectation of privacy exists when "[t]he person challenging the search has . . . a subjective expectation of privacy and that the expectation is objectively reasonable; that is, one that society is willing to accept." United States v. Mendoza, 281 F.3d 712, 715 (8th Cir. 2002) (citation omitted).

For a house guest to assert Fourth Amendment rights in another's home, the asserting party must show that he or she personally has an objectively reasonable expectation of privacy in the place at issue. United States v. Kuenstler, 325 F.3d 1015, 1020 (8th Cir. 2003); see also Kyllo v. United States, 533 U.S. 27, 33 (2001) ("[A] Fourth Amendment search does *not* occur—even when

the explicitly protected location of a *house* is concerned—unless 'the individual manifested a subjective expectation of privacy' . . . and 'society [is] willing to recognize that expectation as reasonable.'" (second alternation in original)). It is well settled that overnight guests have a reasonable expectation of privacy in their host's home. Carter, 525 U.S. at 90. "[A]n overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." Id.; see also United States v. Nabors, 761 F.2d 465, 468 (8th Cir. 1985) (recognizing that a "'casual visitor' to a house does not possess a legitimate expectation of privacy sufficient to challenge [a] search").

White Lance's argument runs contrary to Carter's plain expression that a non-overnight guest present with the householder's consent lacks Fourth Amendment protection in the householder's residence.[4] See United States v. Rose, 613 Fed. App'x 125, 129–30 (3d Cir. 2015) (declining to interpret Carter expansively to recognize a non-overnight guest's expectation of privacy merely because the guest was "legitimately on [the] premises"). Even if this Court were to read Carter to allow such an interpretation, White Lance failed to present facts showing a

[4] At least one court outside the Eighth Circuit has recognized that "being an overnight guest is not the sole means by which one may claim an expectation of privacy in another's home." Hill v. United States, 664 A.2d 347, 352 (D.C. 1995) (citing Rose v. United States, 629 A.2d 526, 530 (D.C. 1993)). Even under that court's rule, however, White Lance's argument fails. The District of Columbia Court of Appeals recognizes that a non-overnight guest may have a reasonable expectation of privacy in a home in which they have the "freedom and capacity of entry and use analogous to that of an inhabitant of the premises." Hill, 664 A.2d at 353; see Rose, 629 A.2d at 531–32 (explaining that the defendant had a legitimate expectation of privacy in a relative's apartment because defendant had his own key, permission to come and go as he pleased, and had authority to admit or exclude others from the residence); see generally Junior v. United States, 634 A.2d 411, 413, 419, (D.C. 1993) (overruling trial court's determination that defendant lacked Fourth Amendment standing because he was not an overnight guest and remanding for trial court to determine whether defendant had a reasonable expectation of privacy in a residence he visited daily to care for homeowner's disabled child, of whom he was a guardian). White Lance lacks the sort of relationship with the Ione Quigley home to prevail under these out-of-circuit cases more liberally applying the Fourth Amendment.

reasonable expectation of privacy at the Quigley home. Before the Supreme Court's decision in Carter, the Eighth Circuit in Nabors analyzed whether a non-overnight guest legitimately on the premises of his or her host had an objectively reasonable expectation of privacy in the host's residence. 761 F.2d 465, 468–69. In holding that the guest did not have Fourth Amendment protection, the court considered several factors: (1) whether the party had a key to the residence; (2) whether the party had the authority to exclude others from the premises; (3) whether the party enjoyed "virtually unencumbered access"; and (4) whether the party received mail or kept personal belongings at the premises. Nabors, 761 F.2d at 468–70.

The facts here reveal that White Lance cannot satisfy any of the above factors and therefore fails to establish an objectively reasonable expectation of privacy in Ione Quigley's home. Although White Lance has been a casual visitor at the Quigley residence on more than one occasion, no evidence shows that he had his own key to the house, had authority to admit and exclude others from the premises, had enjoyed unencumbered access to the household, had received mail or kept personal belongings at the residence, or that he had ever stayed the night at the Quigley residence before. See Nabors, 761 F.2d at 469–70 (holding no reasonable expectation of privacy for a non-overnight guest despite visiting the residence "two or three days a week" over six months). Without evidence showing that White Lance was an overnight guest on December 31, 2022, or January 1, 2023, or had the authority to use the residence in a manner analogous to its primary occupant,[5] he has failed to show a subjective expectation of privacy in Ione Quigley's

[5] The Eighth Circuit's decisions post-Carter appear to require a standard similar to the "freedom and capacity of entry" standard discussed in footnote 2. In cases involving non-overnight motel room guests, the Eighth Circuit has held that the guest must have some possessory interest in or right to use the premises as if they are the primary occupant of said premises to have an objectively reasonable expectation of privacy in the place at issue. See generally United States v. Walton, 188 Fed. App'x 531, 533–534 (8th Cir. 2006) (addressing whether a motel room guest has a reasonable expectation of privacy in another's motel room when they do not spend the night).

residence that "society is willing to accept." See Mendoza, 281 F.3d at 715. This Court therefore overrules White Lance's objection to the Report and Recommendation's conclusion that he lacks standing to assert the protection of Ione Quigley's curtilage.

**2. Curtilage Protection**

Defendants moved to suppress evidence obtained through law enforcement's search of the Chrysler under the theory that it was within the curtilage of Ione Quigley's home and thus not subject to the automobile exception to the warrant requirement or the plain view doctrine. After analyzing Defendants' assertion under the appropriate Dunn factors, Judge Moreno reasoned that White Lance's car was not located within Ione Quigley's curtilage and thus not subject to heightened Fourth Amendment protection. Defendants objected, asserting that Collins v. Virginia, 138 S. Ct. 1663 (2018), is controlling on these facts.

All persons have an objectively reasonable expectation of privacy within their own homes. See Payton v. New York, 445 U.S. 573, 590 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house."). Under the Fourth Amendment, the home also includes curtilage, the area immediately surrounding and intimately associated with the home. See United States v. Dunn, 480 U.S. 294, 300 (1987). The Fourth Amendment's protections do not, however, extend to all areas within the property boundaries of a lot on which a house sits. See generally id.; Collins, 138 S. Ct. at 1670. To qualify as curtilage, "the area in question [must be] so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." United States v. Wells, 648 F.3d 671, 677 (8th Cir. 2011) (quoting Dunn, 480 U.S. at 301). Curtilage can be contrasted with "open fields"—those areas outside the curtilage which are "unoccupied or undeveloped" and do not receive any Fourth Amendment protection. United States v. Mathias, 721 F.3d 952, 955 (8th Cir. 2013) (citation omitted); see also Oliver v. United States,

466 U.S. 170, 180 (1984) (reaffirming "that no expectation of privacy legitimately attaches to open fields"). That said, "open fields" need not be technically "'open' nor a 'field'" to fall outside curtilage's scope. Mathias, 721 F.3d at 955–56 (citation omitted).

In determining whether an area falls within a home's curtilage, this Court considers four factors: (1) the proximity of the area at issue to the home; (2) whether the area at issue is included in an enclosure that surrounds the home; (3) the nature of the uses to which the defendant puts the area; and (4) the steps taken by the resident to protect the area from the public's wandering eye. Wells, 648 F.3d at 677 (quoting Dunn, 480 U.S. at 301). The application of these factors helps determine whether an individual may reasonably expect an area intimately associated with their home will fall within the home's 'umbrella' of Fourth Amendment Protection. Dunn, 480 U.S. at 301.

The case on which Defendants rely, Collins v. Virginia, is distinguishable and suggests that White Lance's car falls outside the curtilage of Ione Quigley's home. In Collins, law enforcement witnessed a motorcyclist commit traffic violations on two separate occasions; both times, the driver eluded police. 138 S. Ct. at 1668. After additional investigation, officers learned that the motorcycle was likely stolen and in Collins's possession. Id. Police discovered photographs on Collins's Facebook page showing the motorcycle parked in the driveway of his girlfriend's home, where Collins regularly stayed the night. Id. Without a warrant, the officers drove to the house where, from their parked car on the street, they spotted what appeared to be a tarped motorcycle at the top of the driveway. Id. One of the responding officers exited the police cruiser, walked up to the motorcycle, untarped the motorcycle, took photos, and ran the motorcycle's license plate and VIN number. Id.

After being indicted for receiving stolen property, Collins moved to suppress the evidence obtained from the officer's warrantless search. Id. at 1669. The trial court denied Collins's motion to suppress, and the Virginia Supreme Court affirmed the trial court's decision based on the automobile exception. Id. at 1669. The Supreme Court reversed, holding that "the automobile exception does not permit an officer without a warrant to enter a home or its curtilage in order to search a vehicle therein." Id. at 1675. In determining that the motorcycle was within the home's curtilage, the Supreme Court described the motorcycle's location in relation to the house:

> According to photographs in the record, the driveway runs alongside the front lawn and up a few yards past the front perimeter of the house. The top portion of the driveway that sits behind the front perimeter of the house is enclosed on two sides by a brick wall about the height of a car and on a third side by the house. A side door provides direct access between this partially enclosed section of the driveway and the house. A visitor endeavoring to reach the front door of the house would have to walk partway up the driveway, but would turn off before entering the enclosure and instead proceed up a set of steps leading to the front porch. When Officer Rhodes searched the motorcycle, it was parked inside this partially enclosed top portion of the driveway that abuts the house.

Id. at 1670–71.

The facts concerning the Chrysler's location in this case are markedly different than those in Collins. The Chrysler was parked with the engine running, just off the public road, in Ione's unenclosed, open, and undeveloped front yard, to the left of a roughly 35-foot-long driveway. ST at 18; Exs. 1 at 7, 2 at 1, 3 at 1–6, 6 at 28–29, 11 at 14. The house was on the driveway's right side when looking from the street—the opposite side from which the car was parked. Exs. 1 at 7, 3 at 2. The Chrysler was not parked next to a house in a garage-like enclosure with a tarp atop it; the Chrysler was stopped and still running with passengers inside adjacent to a street many yards from the Quigley's home. ST at 18, 20, 28–29; Ex. 3.

Application of the four factors from Dunn weigh in favor of finding the Chrysler to be outside the home's curtilage. The Chrysler was an estimated 35 yards from Ione's home; the yard

is not surrounded by any sort of enclosure; no evidence suggests a private nature of use for the portion of the yard where the Chrysler stopped; and the space appears open to neighbors and the public at large. Ex. 3. Without evidence showing that the Quigleys took steps to protect their front yard from public view or used that space for activities most commonly preserved for areas "intimately linked to the home . . . where privacy expectations are most heightened," Defendants' objection must be overruled. California v. Ciraolo, 476 U.S. 207, 213 (1986); see United States v. Bausby, 720 F.3d 652, 656–57 (8th Cir. 2013) (holding that a motorcycle sitting in a front yard enclosed by a chain-link fence was not within the curtilage of the resident's home); United States v. Moses, Crim No. 2:21-cr-160-1, 2023 U.S. Dist. Lexis 84247, at *15, 17 (W.D. Pa. May 12, 2023) (holding that a car parked 20 feet into driveway was not within curtilage because that portion of driveway "was readily visible from the street and from neighbors' yards," and the residents took no "steps to protect the front yard and driveway by erecting a fence, gate, or physical structure to create an enclosure"); Rieck v. Jensen, 651 F.3d 1188, 1193 (10th Cir. 2011) ("[A] driveway abutting and clearly visible from a public [throughway] is not a suitable setting for intimate activities associated with a home."); see generally Katz v. United States, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection.").

Defendants also object to Judge Moreno's alternative conclusion, which stated that even if the area in issue constitutes curtilage, officers had a legitimate law enforcement objective to justify the minor intrusion onto Ione Quigley's front lawn. To make this objection, the defendants merely assert that "White Lance's car was within the curtilage and [they] object[] to the Magistrate Judge's conclusion to the contrary." Doc. 82 at 2.

The Eighth Circuit has consistently held that "where a legitimate law enforcement objective exists, a warrantless entry into the curtilage is not unreasonable under the Fourth Amendment, provided that the intrusion upon one's privacy is limited." United States v. Bennet, 972 F.3d 966, 971 (8th Cir. 2020) (quoting United States v. Bearden, 780 F.3d 887, 893 (8th Cir. 2015)); United States v. Weston, 443 F.3d 661, 667 (8th Cir. 2006); see United States v. Raines, 243 F.3d 419, 421 (8th Cir. 2001). For instance, in Weston, two law enforcement officers responded to Weston's residence to investigate reports of stolen vehicles. 443 F.3d at 664. Weston's residence was not visible from the public throughway by which it could be accessed. Id. The property was also fenced in with "a gate block[ing] the driveway entrance." Id. The residence was further separated from the gate by an approximately 200-yard-long driveway and was oriented in such a manner that the house's front door was not visible from the fence. Id. The responding officers proceeded through the unlocked, but possibly closed, gate to the home's front door. Id. While there, they observed equipment and ingredients commonly used in manufacturing methamphetamine. Id. The officers relied on their observations to obtain a search warrant that yielded evidence used to prosecute Weston. Id. at 664–65. Weston moved to suppress the evidence, which the district court denied. Id. at 666. On appeal, the Eighth Circuit held that the officers' entry into Weston's curtilage was reasonable under the circumstances because the intrusion was limited and done in furtherance of a legitimate law enforcement objective—attempting to contact a potential suspect to obtain his consent to search for evidence of the crime. Id. at 667.

Here, the officers' intrusion on the Quigley property was much more limited and more directly related to the legitimate law enforcement objective of finding those persons who earlier that day entered a home to threaten the reporting parties with a gun and a bat, and then drove off

in a gold Chrysler. ST at 15–16; Ex. 6 at 7. The officers entered Ione Quigley's front lawn (which had no fence, wall, gate, or physical enclosure) only after they identified the suspects' Chrysler sitting occupied and running on the property. Approaching an occupied car associated with an armed burglary is at least as legitimate a law enforcement objective as seeking consent to search for evidence of stolen vehicles, see Weston, 443 F.3d at 667, or locating a civil defendant to serve process upon them, see Raines, 243 F.3d at 421.

**3. Vehicle Search**

Defendant White Lance objects to Judge Moreno's determination that law enforcement's search of the Chrysler (which White Lance owned) and the evidence seized as a consequence was lawful under the automobile exception to the warrant requirement and the plain view doctrine. White Lance's objection hinges on his belief that the car was protected as within the home's curtilage. He asserts that the automobile exception does not apply because the vehicle was within curtilage, and the plain view doctrine does not apply because the officers' presence on Ione Quigley's yard was trespassing. Doc. 43 at 6. Because the Chrysler was not within the home's curtilage and he lacks standing to assert such a protection, White Lance's argument fails. This Court nonetheless will discuss the propriety of the officers' search and seizure of items within the Chrysler.

Generally, the Fourth Amendment requires the issuance of a warrant founded on probable cause before a lawful search or seizure can occur. U.S. Const. amend. IV; United States v. Blaylock, 535 F.3d 922, 926 (8th Cir. 2008) (citing Maryland v. Dyson, 527 U.S. 465, 466 (1999)). The Supreme Court, however, has recognized certain exceptions to the Fourth Amendment's warrant requirement, one such exception being an officer's search of an automobile based on probable cause. Blaylock, 535 F.3d at 926 (citing Carroll v. United States, 267 U.S. 132, 153

(1925)). Since this exception's origination in Carroll, the Supreme Court has identified multiple justifications underlying the exception, including the impracticability of obtaining a warrant for a vehicle that can be moved quickly outside the jurisdiction, "the pervasive regulation of vehicles," and the reduced expectation of privacy one has in their car based on "the relative openness of [its] passenger compartment." Id. (citations omitted). Even so, the Supreme Court has made it clear that "the automobile exception does not permit an officer without a warrant to enter a home or its curtilage in order to search a vehicle therein." Collins, 138 S. Ct. at 1675. As discussed above, however, White Lance's car was not parked within the curtilage of Ione Quigley's home, nor does he have standing to assert such protection. Therefore, so long as RSTLE law enforcement had probable cause to search White Lance's vehicle, the search was reasonable under the circumstances.[6]

"A police officer has probable cause to conduct a search when the facts available to him [or her] would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." Florida v. Harris, 568 U.S. 237, 243 (2013) (citing Texas v. Brown, 460 U.S. 730, 742 (1983)) (cleaned up). Probable cause cannot be reduced to a "precise definition or quantification." Id. (quoting Maryland v. Pringle, 540 U.S. 366, 371 (2003)). All probable cause requires is a "fair probability" on which "reasonable and prudent [people,] not legal technicians, act." Id. at 244 (quoting Illinois v. Gates, 462 U.S. 213, 238, 231 (1983)). In determining whether the "practical and common-sensical standard" of probable cause is met, courts look to the totality

---

[6] Notably, Defendants base their objection only on the inapplicability of the automobile exception under the theory of curtilage. They do not argue that the search otherwise does not meet the criteria necessary for the automobile exception to apply. Therefore, this Court need not undertake an exhaustive analysis of the automobile exception, but notes that the car was occupied and running when police arrived on scene. See Blaylock, 535 F.3d at 927 (automobile exception applies when vehicle appears readily mobile).

of the circumstances. Id. (citations omitted). When probable cause exists, it "justifies the search of every part of the vehicle and its contents that may conceal the object of the search." United States v. Bettis, 946 F.3d 1024, 1029 (8th Cir. 2020) (citation omitted).

Under the plain view doctrine, observing contraband or evidence of a crime in a vehicle can "give[] rise to probable cause to perform a warrantless search of a vehicle." See United States v. West, 280 Fed. App'x 563, 566 (8th Cir. 2008) (citing Texas v. Brown, 460 U.S. 730, 742–43). "For the plain view doctrine to apply, not only must the officer be legitimately in a position to view the object, but it must be immediately apparent to the police that they have evidence before them." Brown, 460 U.S. at 736.

"[U]nder the Fourth Amendment, the question is not whether the officers were trespassing, but whether [the Defendant] had a reasonable expectation of privacy." United States v. Lakoskey, 462 F.3d 965, 973 (8th Cir. 2006). An officer does not violate the Fourth Amendment by approaching a lawfully stopped car and looking in from the outside after all the occupants have exited. United States v. Vinson, 805 F.3d 1150, 1152 (8th Cir. 2015). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Ciraolo, 476 U.S. at 213 (1986) (citation omitted). Officers Falls Rock, Little Shield, and Blacksmith all had legal justification to enter Ione Quigley's front lawn to investigate a vehicle suspected to have been involved in an armed burglary that morning. ST at 18. Additionally, as explained in the Report and Recommendation, the finding of the gold, dealer-plated Chrysler, the identification of the two suspects, and the plain view observation of the brass shell casing and the bat are enough to give rise to probable cause to search the vehicle and seize evidence found.

**4. White Lance's Statements to Officer Little Shield**

White Lance objects to Judge Moreno's determination that White Lance's statements to Officer Little Shield were not the result of impermissible custodial interrogation. Although White Lance was assuredly within custody when talking to Officer Little Shield, see United States v. Garreau, 735 F. Supp. 2d 1155, 1167 (D.S.D. 2010) (stating that a handcuffed, arrested defendant sitting in the back seat of a patrol car is in custody for purposes of Miranda), their conversation cannot be classified as an interrogation. Officer Little Shield's questions for White Lance concerned his apparent injury and whether he needed a medical evaluation. Ex. 13 at 12–15. Officer Little Shield asked to see White Lance's injured eye, asked how long it had been like that, asked about his blood loss, and informed White Lance that "he was checking to make sure [he] don't need stitches or anything on that injury of [his]." Id. at 14. None of these questions were tailored to illicit incriminating statements. See id. at 12–15. Any information given beyond answering those simple questions was unprompted and volunteered by the defendant. See United States v. Jackson, 852 F.3d 764, 772 (8th Cir. 2017) (stating that Officers' "questions regarding [defendant's] health do not constitute an interrogation").

**5. Fruit of the Poisonous Tree**

White Lance also moves to suppress the statements he made to Special Agent Kumley on January 2, 2023. White Lance argues that his statements stem from an illegal search of his car the day before. Because that prior search involved no violation of the Fourth Amendment, this Court agrees with Judge Moreno that "there is no 'poisonous tree' for any 'tainted fruit' to grow or fall from." Doc. 79 (citing United States v. Hessman, 369 F.3d 1016, 1023–24 (8th Cir. 2004) (stating that no poisonous tree existed when the search preceding the defendant's statements was legal)).

## III. Conclusion

For the reasons addressed above, it is

ORDERED that the Objections to Report and Recommendation, Doc. 82, are overruled and that the Report and Recommendation, Doc. 79, is adopted. It is further

ORDERED that Defendants' motion to suppress, Docs. 42, and its oral supplement, ST at 9, are denied.

DATED this 7th day of November, 2023.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE